# THE M. W. UNITED GRAND LODGE OF FREE AND ACCEPTED MASONS OF MARYLAND

*vs.*

## WM. F. GREEN, Grand Master of the Free and Accepted York Masons, et al.

*Fraternal Organization—Use of Name "Masons"—Injunction.*

In case of dispute between fraternal organizations as to the use of a particular name, relief will not be given by way of injunction unless the right thereto is clearly established.  p. 592

On an issue between two bodies or associations of colored persons, each claiming a superior right as to the use of the appellations "Masons" and "Free Masons," *held* that the evidence being conflicting, the plaintiff was not entitled to an injunction to restrain defendant from using such appellations and from establishing lodges thereunder.  p. 592

*Decided June 17th, 1920.*

Appeal from the Circuit Court No. 2 of Baltimore City (Dobler, J.).

The cause was argued before Boyd, C. J., Briscoe, Thomas, Pattison, Urner, Stockbridge, Adkins and Offutt, JJ.

*Edwin T. Dickerson* and *W. Ashbie Hawkins*, with whom were *Hawkins & McMechen* on the brief, for the appellant.

*Charles W. Main* and *Benjamin H. McKindless*, for the appellees.

Boyd, C. J., delivered the opinion of the Court.

The Most Worshipful United Grand Lodge of Free and Accepted Masons of Maryland, Incorporated, filed a bill in

equity against the Grand Master of the Free and Accepted
York Masons, the Worshipful Master of a Lodge affiliated
with the Free and Accepted York Masons and twenty-four
others, who are alleged to be the officers and members of a
voluntary unincorporated body of men, known as Mount
Sinai Lodge No. 1 Free and Accepted Ancient York Masons.
The object of the bill is thus stated in the prayer:

> "That the said * * * may be enjoined from using
> the name of Masons, or Free Masons, as the name of
> a fraternal, benevolent or charitable organization, and
> from using any name of which the term Masons or
> Free Masons forms a part, or using the said words
> Masons or Free Masons for any purpose, whether
> alone, or in conjunction with any other words; and
> from engaging in any other effort to add to the mem-
> bership of said Mt. Sinai Lodge, or from organizing
> any other lodges of the same kind and character bear-
> ing the name of Masons or Free Masons or any other
> name which the name Masons or Free forms a part,
> and from in any manner representing as members of
> said lodge so organized, or as being members of the
> Order of Masons, or Order of Free Masons, or con-
> nected in any way with said order, or in any way form-
> ing a component part of the said Order of Masons or
> Order of Free Masons."

The plaintiff (appellant) alleges that for many years prior
to the grant of any of its charters referred to in the bill:

> "The Fraternity of Ancient Free and Accepted
> Masons, now generally known as Free and Accepted
> Masons, had operated among colored men in the State
> of Maryland, sometimes with divided ranks, bearing
> different names, but holding all of them to the essen-
> tial rites, ceremonies and traditions of the great Fra-
> ternity of Free Masons, until in the year 1876 all of
> these separate bodies of colored men claiming the
> rights and benefits of the Fraternity of Free Masonry
> were united in one body, known as The Most Wor-
> shipful United Grand Lodge of Free and Accepted

Masons of the State of Maryland, and that from that
date until very recently no other body of Free Masons,
operating among colored men, has been known in this
State, nor has authority been given to nor exercised by
any other body of men to so operate in this State."

It is also alleged that the appellant has at this time about
2,000 members in this State, who are attached to and mem-
bers of forty-eight subordinate lodges, located in different
parts of the State, which are component parts of and are
under the supervision of said Grand Lodge; that it has since
its first institution among the colored men in this State, and
before then in Boston and where the Fraternity of Masons
existed among colored men:

"borne at different times the name of Ancient Free
and Accepted Masons and of Free and Accepted Ma-
sons, and this name has been continuously used by the
complainant, and now is used by it and its votaries,
and by long use it has acquired the sole and exclusive
right to use such name as it refers to colored men in
the State of Maryland, and no other persons or order
has any right to the use of such name as it refers to
colored men in this State, either along with or in con-
nection with any other words, or parts of a name, of
any other fraternal organization operating among col-
ored men in the State of Maryland."

It further alleges that the use of the name Masons by the
defendants has caused and is causing great confusion and is
tending to mislead the public into believing that the defend-
ants, constituting the said Mount Sinai Lodge No. 1, is a
part of appellant's organization, whereas it is not and can-
not be,

"but is made up largely of a class of men who cannot
become affiliated with any regular body of Free Masons
anywhere, and as part of its scheme to embarrass your
complainant it is making the claim that it, and not
your complainant, is the original Order of Free Ma-
sons."

GRAND LODGE F. & A. MASONS vs. GREEN. 585

Md.]                    Opinion of the Court.

Among other things, it is alleged:

"That the use of the name Masons by the defendants, its agents, servants and members is part of a
fraudulent scheme to induce the public and those seeking to join the Order of Free Masons into believing
that they are joining the said named order, and it will
be impossible to prevent such persons from so believing if said defendants are allowed to continue to use
the same name, all of which is contrary to equity and
is a fraudulent and illegal invasion and an infringement of the rights of the Order of Free Masons in the
premises and a fraudulent and inequitable competition
in business, and an infringement upon and an illegal
invasion of the rights, good-will and name of the
Order of Free Masons."

An order to show cause why a writ of injunction should
not be issued as prayed was passed, the defendants answered
and, after a large amount of testimony was taken, the bill
was dismissed and this appeal was taken. The defendants
denied all allegations of deception, fraud, misleading acts,
etc., and set out in some detail a history of the organization
of colored lodges of Masons. They allege:

"That in the year 1775 or 1776 a regiment of British soldiers stationed in Boston, in possession of regular authority from the Grand Lodge of England, made
Masons of a number of colored men, who obtained a
dispensation under which they worked for a number of
years, and that in November, 1784, the Grand Lodge
of England granted to one Prince Hall and other colored men residing in Boston a charter under the name
of African Lodge No. 457 of the roll of the Grand
Lodge; that thereafter other lodges were warranted in
other States of the Union, and that on or about the
24th day of June, 1847, a convention was held in the
City of Boston, composed of representatives from the
various lodges of colored men throughout the United
States," who unanimously adopted a resolution "to organize and open a National Grand Lodge of Free

586 GRAND LODGE F. & A. MASONS vs. GREEN.

Opinion of the Court.                    [136

and Accepted Ancient York Masons, National Com-
pact, Inc., for the United States of America and Ma-
sonic jurisdiction; that the said National Grand Lodge
working under and by authority of the only warrant
that was ever granted colored Masons in the United
States, established subordinate and Grand State lodges
in the different States of the Union, among which was
Friendship Lodge No. 6 of Baltimore City, Maryland,
warranted on the 2nd day of February, 1825, and that
thereafter other subordinate lodges were organized by
the National Grand Lodge within the State of Mary-
land, and that some time thereafter, about the year
1873 or the year 1874, the Grand Lodge of Maryland
seceded and withdrew from the National Grand Lodge,
carrying with it the warrant that had been given it by
the National Grand Lodge."

It is alleged that the appellant was declared by the Nat-
ional Grand Lodge to be rebellious and was expelled, and was
existing only as a spurious and clandestine body and has no
masonic authority whatever from the National Grand Lodge.

It is further alleged that the respondents in August, 1918,
formed a club and made application for membership in the
so-called body (the plaintiff), that one Joseph P. Evans, the
Grand Master of the said lodge, met the respondents and
after lecturing to them, accepted ten dollars for an applica-
tion for membership in the said lodge; that they were ex-
amined by a physician and passed the physical test and sev-
eral of them desired to be informed whether the appellant
was connected in any way with any National Grand Lodge
and were informed that it was not, thereupon all of the re-
spondents refused to become members of the said lodge and
made application to the National Grand Master of Masons
at Montgomery, Alabama, for a warrant as a subordinate
lodge of the National Body; that the National Grand Master
of Masons sent the National Grand Organizer for the State
of Virginia and adjacent territory to Baltimore with a war-
rant and masonic authority to organize respondents into a

subordinate lodge, which he did on the 20th of November, 1918, under the name of Mount Sinai Lodge No. 1 Free and Accepted Ancient York Masons, National Compact.

It is thus seen that the plaintiff claims to be the only authorized masonic power in this State, while the respondents claim that it is spurious and clandestine, and that they are the duly authorized Masons through the action of the National Grand Lodge. The evidence is conflicting, the feeling is bitter and it is not the kind of case which appeals to a court of equity. It is always unfortunate when such controversies get into the courts, and before a court of equity can grant such relief as is sought in this case the right to it must be clearly established. It is not merely a question of what relief a court of equity can grant to an Order, to protect it from an unjustifiable use of its name, etc., by those having no claim of right to use them, but the first question is whether the appellant has shown that it has such an exclusive right to represent the colored Masons of Maryland that it can properly ask a court to prohibit by injunction the respondents from doing what it complains of.

Each side claims descent from a lodge which was established in Boston under the name of African Lodge No. 459 (457 in answer), generally referred to as Prince Hall Lodge. The first colored persons who became Masons were admitted to an English army lodge attached to the command of General Gage, at Boston in 1775, as stated in *Funk and Wagnalls' Standard Encyclopedia*, and as we understand to be admitted in this case. Lodges were established in the different states, and Grand Lodges were formed in Massachusetts, Rhode Island, New York and Pennsylvania. William Henry Grimshaw, assistant librarian in Congress, wrote a book on the history of Free Masonry among colored people in the United States. He was a witness for appellant and testified that the first lodge of colored Masons in the United States was organized at Boston in 1784, and said it was still in existence. He said that there was a lodge in Massachusetts called Prince Hall Grand Lodge of Massachusetts, which was

established in 1848, and that that was the present Grand Lodge, but the original Grand Lodge of Massachusetts was established in 1792 by the authority of the Grand Master of England, issuing the warrant to Prince Hall Lodge; that that existed until several lodges were formed in the United States, and then they organized the Prince Hall Grand Lodge, which prior to that was called African Grand Lodge; that Prince Hall Grand Lodge, by the authority of the Grand Master of England, had jurisdiction over all the United States and had authority to open lodges which were amenable to the Grand Lodge of England. He testified that in 1847 the Grand Lodges of New York, Pennsylvania and Rhode Island (we suppose Massachusetts also) called several men from their jurisdictions to meet in Boston,

> "to consult as to the *death message* (best method, we suppose) of distributing Masonry over the states in the Union. There was no other colored lodges nowhere in North America at that period. These men came together, three representatives from each of these bodies, and they styled themselves 'National Compact.' It was for the purpose of advising the Grand Masters of the several states as these lodges might be made in the several states, how to practice Ancient Freemasonry, as an advisory body only, without charter, without any authority whatever; they simply assumed that authority. They never were chartered, never had any charter from England, nor does the English constitution recognize anything as the National Compact, nor would one be admitted in the anteroom of a Grand Lodge of a regularly made lodge."

He further testified that the National Compact, "as it is called," existed from 1848 until 1874, and he read from his book the following resolution:

> "At a meeting of the National Grand Lodges held in Wilmington, Delaware, in the year 1877, the following resolution was unanimously adopted: Resolved, That each state is its sovereign head and that each delegate

be directed to report to his state Grand Lodge the
action taken by this body. And be it further resolved,
That the National or Compact Grand Lodge is and
the same is hereby declared to be an irregular and
unheard-of body in Masonry, and it is hereby declared
forever void."

Immediately below that in the record is the following:
"In this connection the defendants offered in evi-
dence a pamphlet written by Dr. H. M. Butler, another
State Rights Mason, wherein he states that the conven-
tion of the National Grand Lodge was held in Wil-
mington in 1878, and the resolution adopted was as
follows: Resolved, That the National Grand Lodge do
wind up its affairs and adjourn *sine die.*"

There does not seem to be any explanation as to why the
two authors gave different dates for the meeting, and differ-
ent resolutions as passed at it. It is not only denied by the
appellees that the National Grand Lodge was wound up and
adjourned *sine die,* but they offered evidence to show that
regular meetings were held as late as 1918. Rev. J. M. Cor-
nell testified that he had been a Mason for thirty years, and
for the entire time had "been a very ardent student of the
institution." He was a member of the Free and Accepted
Ancient York National Compact and he had been Grand
Master of Tennessee, which recognized the National Grand
Lodge as the superior body. He testified that the National
Grand Lodge had been in existence continuously since it
began in 1847; that the Grand Lodges of Massachusetts,
Rhode Island, New York and Pennsylvania were represented
at that meeting and they were all of the Grand Lodges of
colored people in this country at that time; that they adopted
sentiments and principles which were to govern the craft
among colored men for all time to come. He was then handed
a book (which is not explained) and said that it contained
the sentiments adopted by the National Grand Lodge.

Amongst other "Sentiments," as they are called, set out in the record, is the following:

> "Therefore, in solemn convention assembled, we do, in the name of the great Masonic body of Free and Accepted A. Y. Masons, declare ourselves a free and independent body of Masons, to be known as the National Grand Lodge of Free and Accepted Ancient York Masons (Colored) of the United States of America and Masonic Jurisdiction thereto belonging, with full power and authority to grant warrants of constitution to all state Grand Lodges under our jurisdiction, and that the said state Grand Lodges shall have full power and authority to grant letters of dispensation and warrants of constitution to subordinate lodges within their several jurisdictions, and to establish as many lodges as they deem most expedient."

He further testified that on June 24th, 1848, all of the Masons of color in the United States held a convention in New York City and confirmed and ratified the action of the Boston convention of the preceding year. He gave the names of the Grand Masters of the National Compact from the first one to the present time—including Bishop John Wesley Allstalk, who was the incumbent when he testified; that the National Grand Lodge has held meetings once every three years, that he attended one in 1898 at Columbus, Ohio, one at Chattanooga, Tenn., in 1901, and one at Atlanta, Ga., in 1904, that those were all he had attended in person but that he had received a summons from the Most Worshipful National Grand Lodge to attend them for a period of twenty-nine years. Robert J. Simmons testified that he was Right Worshipful National Grand Secretary of Free and Accepted Ancient York Masons, National Compact—being the National Grand Lodge—that he had attended sessions of the National Grand Lodge in Washington, D. C., in 1909, Orangeburg, S. C., in 1912, Atlanta, Ga., in 1915, and Louisville, Ky., in 1918. He was made secretary at Washington and the minutes of that meeting were before him. He said that the

National Grand Lodge had Grand Lodges in twenty-eight states—approximately twenty-five hundred lodges which recognized the National Grand Lodge. He also testified as to who the Grand Master of the National Grand Lodge was, and said from his reading and conversation with well-informed Masons his understanding was that the National Grand Lodge had held sessions from the time of its organization to the present; that in 1888 the Maryland Grand Lodge, together with some others, became rebellious and were expelled. The Rev. Solomon Hudson testified that he had been a Mason since April, 1876, and he attended three meetings of the National Grand Lodge—at Wilmington, Del., in 1878 and 1881, and at Washington in 1909. He said that the National Lodge did not adjourn *sine die* in 1878, that the meeting was in 1878 and not in 1877, as Mr. Grimshaw said, and from his knowledge of the history of Masonry and his personal knowledge he said that the National Grand Lodge had been a continuous body from its formation to the present time. Rev. William H. Benderson, who organized the Mount Sinai Lodge in Baltimore, was the Grand Master of the State of Virginia and National District Deputy Grand Master of the National Grand Lodge of Virginia, District of Columbia, Maryland and North Carolina. He was sent to Baltimore by Bishop Allstalk, National Grand Master. He said there were three lodges now in Baltimore connected with the National Compact, having about two hundred members, and that in Virginia there were between 150 and 175 lodges, having from 3,000 to 3,500 members connected with the National Compact.

We have thus at some length referred to the testimony of witnesses on both sides. The evidence on neither side can be regarded as satisfactorily establishing the claim to its right to represent the Masonic Fraternity among colored people, to the exclusion of the other. Like most church, fraternity and family quarrels which get into courts the evidence is unsatisfactory because it is colored by prejudices and partisan views of most things connected with the controversy. Neither

of these factions is recognized by the white Masons of this country, although both have amongst their numbers ministers of the Gospel and others who would seem to be amongst the most intelligent colored people. But the appellant has the burden of satisfying the court that it is entitled to the claim it makes to the exclusion of the other side. It is sufficient to say that it has not established to our satisfaction the right to have the appellees enjoined from the use of the name Masons or Free Masons, or from having lodges in Baltimore, or doing the other things mentioned in the prayer of the bill. The evidence is not of the certain and authentic kind which a court should require before undertaking to determine such questions between two branches of factions of an order. There is irreconcilable conflict between the witnesses who ought to be the best informed.

Having reached the conclusion indicated above, it will serve no good purpose to further prolong this opinion. It may be well to add that by refusing the injunction we do not determine which of the two factions properly represents the colored Masons of this country, or of Maryland, but only that the right of the appellant to enjoin the defendants as prayed for is not sufficiently sustained to justify the Court in doing so, and the decree dismissing the bill of complaint will be affirmed.

*Decree affirmed, the appellant to pay the costs.*